2020 IL App (1st) 182368-U

Order filed October 30, 2020

FIFTH DIVISION

No. 1-18-2368

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 16469 (02) |
| | ) | |
| ARRONIS JACKSON, | ) | Honorable |
| | ) | Neera Lall Walsh, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Cunningham concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirmed defendant's conviction for concealment of a homicidal death, finding that the prosecutor made no improper remarks during opening statement and closing arguments and that the trial court did not err in its admission of evidence.

¶ 2   A jury convicted defendant, Arronis Jackson, of the concealment of the homicidal death of Laneesha Miller and the trial court sentenced him to eight years' imprisonment. On appeal, defendant contends that the prosecutor made improper remarks during opening statement and closing argument. Defendant also contends that the trial court erred by admitting the testimony of

Laneesha's parents as life and death witnesses; admitting autopsy photographs; and admitting a witness's prior consistent statements. We affirm[1].

¶ 3    At trial, Laneesha's mother, Theresa Miller, testified that in June 2015, Laneesha and two of her children were living in Chicago. Laneesha's third child, Makayla, was living in Atlanta. Makayla was scheduled for surgery in Atlanta on June 25, 2015. Theresa spoke with Laneesha on June 16, 2015, and Laneesha indicated that she was planning on returning to Atlanta on June 23 to be present for the surgery. However, Laneesha did not come to Atlanta on June 23, nor did she contact Theresa to tell her that she was not coming. Theresa never heard from Laneesha again.

¶ 4    Laneesha's father, James Miller, testified that he lives in Michigan and last spoke with Laneesha on Father's Day, June 20, 2015, and learned at that time that Laneesha was dating Paul Meyers. When Laneesha did not come to Atlanta on June 23 as planned to attend Makayla's surgery, James filed a missing person's report. In June 2017, James went to the morgue in Cook County to pick up Laneesha's remains.

¶ 5    Dara Manor testified that defendant and his brother, Paul Meyers, are her cousins. In June 2015, defendant and Paul lived in a home off 87th Street owned by an elderly woman named Miss Stewart. In early July 2015, Dara and defendant were watching a news broadcast on television regarding a woman in Indiana (not Laneesha) who had been missing and was subsequently found dead in a lake. Defendant asked Dara, whose husband was a mortician, about how bodies decompose when they are submerged in water for a period of weeks. Dara explained the stages of rigor mortis to defendant.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

¶ 6    During the week of July 13, 2015, Dara was driving defendant to his home when he asked her to pull over so that he could speak with her. Dara pulled over, and they got out of the car. Defendant told Dara that on June 20, 2015, he and Paul were at their home with a couple of women, Laneesha and Tina. Paul and Laneesha went into one bedroom; defendant and Tina went into another. Defendant eventually left Tina, went to Paul's bedroom, and saw that Laneesha was dead. Paul told defendant that he had choked Laneesha and then beat her with a hammer "to make her bones smaller," so that she would be unable to be identified. Paul asked defendant to help him get rid of her.

¶ 7    Defendant and Paul then paid "some people that were on drugs" to help them put Laneesha's body parts in bags. They wrapped one of the bags with a dog chain. Defendant and Paul put the bags in the trunk of Laneesha's car. Defendant gave Paul directions to a lake where the body could be disposed. Paul drove Laneesha's car to the lake; defendant drove there in a separate car. Defendant and Paul threw the bags containing Laneesha's body parts in the lake. Defendant threatened to kill Paul if he ever told anyone about "where [Laneesha] was."

¶ 8    Defendant told Dara that he also cleaned Paul's bedroom and bathroom with bleach.

¶ 9    Martha Skipper testified that Paul and defendant lived in Miss Stewart's house. Defendant had a bedroom in the basement; Paul's bedroom was on the first floor. Martha used to buy drugs from Paul and she had been inside their home many times. In mid-June 2015, Martha saw defendant moving a mattress out of Paul's room into the garage. Martha asked defendant why he was moving the mattress, and defendant replied that Paul "had to get out of there."

¶ 10    A few days later, defendant asked Martha to clean Paul's room. Defendant explained to Martha that Paul had moved out and that Miss Stewart wanted the room cleaned so that she could rent it out. Defendant pointed out about four or five red spots on the carpet in Paul's room, and

five or six red streaks on the wall. Martha agreed to clean Paul's room in return for $15 and a bag of crack. Martha used a bleach and water solution to clean the spots on the carpet and wall. As Martha cleaned, the solution on the carpet foamed up red. Martha asked defendant what the stains were, and he told her they were all wine stains. After she finished cleaning, defendant looked in the room and told her that she had done a good job and he paid her.

¶ 11    About one month later, Martha became aware that Paul's girlfriend, Laneesha, was missing and was presumed to have been murdered. Martha feared that by cleaning Paul's room in June 2015, she had "cleaned up a crime scene."

¶ 12    Detective Dale Potter testified that on June 29, 2015, he learned that Laneesha's car had been recovered at 121st and Wallace in Chicago. Detective Potter executed a search warrant of the car on June 30. Officers opened the trunk of the vehicle and Detective Potter saw that the bottom of the trunk was moist with a reddish stain and covered in maggots.

¶ 13    Later that day, Detective Potter executed a search warrant at Miss Stewart's house, which was the last location that Laneesha had been seen. Detective Potter went to a bedroom on a lower level where he smelled a chemical smell like a cleaning solution or chlorine. On September 9, 2015, Paul was arrested for Laneesha's murder.

¶ 14    Sergeant Gary Bush testified that on September 9, 2015, defendant was arrested outside his home. Sergeant Bush and his partner, Officer Anthony Pacino, placed defendant in their vehicle and they began to drive him to the police station. As they were driving, defendant stated that he knew where Laneesha's body was located. Sergeant Bush gave defendant his *Miranda* warnings, after which defendant stated that he had helped his brother Paul "throw some bags into the Little Calumet River off the Bishop Ford expressway." Defendant directed them to a bridge at that location and he told the officers that he and Paul had attached a cinder block to the bags and thrown

them over the west side of the bridge into the river. Sergeant Bush looked over the bridge but did not see any bags in the river at that time.

¶ 15    Detective Pacino testified consistently with Sergeant Bush regarding how after they began transporting defendant to the police station on September 9, 2015, defendant told them he knew where Laneesha's body could be found and he directed them to the bridge on the Bishop Ford expressway. Defendant told them that when disposing of her body, he and his brother Paul had driven two separate vehicles to the bridge. Defendant explained that Paul pulled over to the side of the bridge and defendant pulled up behind him. They each exited the vehicles. Paul opened up the trunk of his vehicle. Inside the trunk, there were several bags tied together with a chain and a cinder block. Defendant helped Paul throw the bags over the bridge into the river.

¶ 16    On September 10, 2015, Detective Pacino, Sergeant Lamperis, and Officer Chuck Honore went to the bridge to look for the bags that defendant and Paul had thrown into the river. Officer Honore looked through a pair of binoculars and saw something on the side of the river at the end of the bank. The officers walked to that location on the bank of the river and discovered "a suitcase with chain wrapped around it, cinder block and another bag connected to it."  Detective Pacino also saw another round bag on the shore.

¶ 17    Detective Pacino opened the round bag and discovered a human head inside. He did not open the other bags but instead called for a forensic investigator to come and recover them. Meanwhile, the detective walked along the shore and saw "a body part" on the side of the embankment. The body part consisted of buttocks attached to a spine.

¶ 18    Over defense objections, the State showed Detective Pacino Exhibits 9-23, which were a series of photographs. The detective identified Exhibits 9-11 as photographs of the bridge on the Bishop Ford expressway. Exhibit 12 was a photograph of the path at the end of the bridge that the

officers walked down to view the recovered items. Exhibit 13 was a photograph of the bank of the river and it also depicted several of the bags that were recovered. Exhibits 14 and 18 were photographs of two bags at the riverbank that were chained together and tied around a cinder block. Exhibit 15 was a photograph of the cinder block. Exhibits 16 and 17 were photographs of the luggage that was also discovered in the river. Exhibit 19 was a photograph of the round bag that the detective had opened. Exhibit 20 was a photograph of the human head that was discovered inside the round bag. Exhibits 21-23 were photographs of the buttocks attached to a spine that was found on the side of the embankment.

¶ 19    Dr. Poni Arunkumar testified that she supervised the autopsy of Laneesha in September 2015. Laneesha's body was "received in parts that were dismembered. They were present in black plastic bags, in a suitcase that was tied with a cinder block. And there was significant *** decomposition that was evident in the body parts." Laneesha's head, which was severed from the rest of her body, showed a fracture over the left frontal bone that extended through the left eye socket and into the right base of the skull. There was also a fracture in the lower jaw and in a bone in her left hand. The fractures were the result of blunt force and were classified as perimortem injuries, meaning that they occurred close or before the time of death.

¶ 20    Dr. Arunkumar also observed a number of postmortem injuries to Laneesha, specifically, the injuries that severed her head from her body, and that dismembered her arms and legs from her torso. A hand saw was most likely used to dismember Laneesha's body.

¶ 21    People's Exhibits 28-36, which were photographs taken during the autopsy, were admitted into evidence. Dr. Arunkumar explained that Exhibit 28 was a photograph of Laneesha's skull and face showing the fracture on the left side and some tissue in the eye sockets. Exhibit 29 was a photograph of the left side of the head, showing the fracture starting from the left eye socket and

extending upward to the back of the head. Exhibit 30 was a photograph of the fractured lower jaw. Exhibit 31 was a photograph "of how the body parts of Laneesha Miller were received." The photograph depicts "two forearms with attached hands but no upper arms, portions of the feet and attached upper legs. *** [A]t the upper end is the buttock area that had the attached spine to it." Exhibit 32 was a photograph of the left hand and left forearm. Exhibit 33 was a photograph of the right hand and right forearm. Exhibit 34 was a photograph of "the left foot [with] attached portion of the left leg." Exhibit 35 was a photograph of the buttock with the attached spine. Exhibit 36 depicted an unidentified body part with a "clean cut" to the bone.

¶ 22    Dr. Arunkumar opined that the manner of death was homicide by unspecified means. While the blunt force injuries to Laneesha's skull could have caused death in and of itself, unknown injuries to her missing body parts could also have contributed to her death.

¶ 23    The parties stipulated that forensic scientist Lynette Wilson would testify that the DNA profile from the stain in the trunk of Laneesha's car matched her DNA profile.

¶ 24    Defendant testified that in June 2015, he and Paul lived at Miss Stewart's house at 2650 West 87th Street. On June 21, 2015, defendant was in the basement with two friends smoking crack. Paul and their cousin Raphael were "doing cocaine" upstairs. Laneesha was also somewhere in the house. Defendant heard an argument in Paul's room. Defendant went to Paul's room and knocked on the door. Raphael answered. Defendant then went back downstairs because he knew that Raphael had a gun and could take care of himself in an argument. Defendant did not see Laneesha inside Paul's bedroom.

¶ 25    The next day, June 22, defendant knocked on Paul's door but there was no answer, Defendant opened the door and saw that the sheets were no longer on his bed. Defendant went back to his room and smoked some crack cocaine.

¶ 26    Sometime later that week, defendant had a conversation with Paul, after which Paul got into Laneesha's car and asked defendant to follow him. Defendant did not know where they were going. Defendant got in his mother's car and followed Paul to the bridge over the Bishop Ford expressway. Paul got out of Laneesha's car and popped the trunk. Defendant saw five suitcases belonging to Laneesha. The suitcases were tied to a cinder block with a dog chain. Paul pulled four of the suitcases out of the trunk and asked for some help. Defendant helped Paul pull the fifth suitcase out of the trunk. Paul then threw the suitcases over the bridge into the river; defendant testified that he did not help Paul throw them and he did not then know what was in the suitcases. Defendant was impeached with a clip of the video-recorded statement he gave to Assistant State's Attorney Emily Leuin at the police station after he was arrested when he told her that he helped Paul throw the luggage over the bridge.

¶ 27    Defendant testified that Paul got back in Laneesha's car and drove away from the bridge. Defendant followed. Paul parked Laneesha's car somewhere near 121st and Wallace and then got in defendant's car. Paul pulled out a gun and told defendant that Laneesha's remains had been in the suitcases and he threatened to kill defendant if he said anything about Laneesha's death. At that point, defendant was not sure if Paul had killed Laneesha; defendant thought that perhaps someone else had killed her. Defendant drove them home and he smoked some more crack.

¶ 28    Defendant subsequently asked Martha Skipper to clean Paul's room because he had moved out and Miss Stewart wanted to rent it out. Defendant paid her with money and drugs. After defendant was arrested on September 9, he realized that Paul had killed Laneesha. Defendant led the officers to the bridge where they had disposed of her remains because he "felt that [the officers] should know what Paul had done."

¶ 29    Defendant denied telling Dara Manor that he had seen Laneesha dead in Paul's room and that Paul asked him to help get rid of the body. Defendant also denied telling Dara that he helped put Laneesha's body parts in the trunk of her car or that he threatened to kill Paul if he told anyone where they disposed of her.

¶ 30    Following his conviction and sentence, defendant filed this timely appeal. First, defendant contends that the State made improper remarks during opening statement that denied him a fair trial. The prosecutor stated in pertinent part:

"This case is about a horrific crime that at its core involves three people. The first person I would like to introduce you to is Laneesha Miller. She was a beautiful young woman who was brutally murdered by her boyfriend, Paul Meyers, which brings us to person number two. After Paul Meyers killed Laneesha, he needed help covering up the murder, getting rid of the body, and cleaning up the crime scene which brings us to person number three, the defendant in this case, Arronis Jackson. The defendant helped Paul Meyers cover up the murder, clean up the crime scene and get rid of Laneesha Miller's body. It is a crime in and of itself to cover up a murder and that crime is called the concealment of a homicidal death and that is what he is charged with.

After Laneesha was murdered, her bloody body was wrapped in his blanket and then he and Paul Meyers carried Laneesha's bloody body out of their house and they put her into the trunk of her very own car. *** As if what I have just told you isn't gruesome enough, Paul Meyers then dismembered Laneesha's body. He took a hand saw and he cut Laneesha into pieces and he put what was once her beautiful body that was now in bloody pieces into multiple bags. *** Together the two men drove on the Bishop Ford highway to a bridge on the Little Calumet River. There the two men together hoisted these bags out of

the trunk and threw them over the bridge into the river *** . Laneesha isn't here to tell you how she was savagely murdered and mutilated, but we know everything *** because the defendant confessed."

¶ 31    Defendant forfeited review of the prosecutor's comments during opening statement by failing to object. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Even choosing to address the issue on the merits, we find no reversible error.

¶ 32    Opening statements are meant to inform the jury of what the parties intend to prove at trial. *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 29. While no comment should be made therein that counsel cannot or will not prove, opening statement may include a discussion of expected evidence and reasonable inferences therefrom. *Id.* Reversible error only occurs when "the prosecutor's opening comments are attributable to deliberate misconduct of the prosecutor *and* result in substantial prejudice to the defendant." (Emphasis in original.) *People v. Kliner*, 185 Ill. 2d 81, 127 (1998).

¶ 33    The prosecutor's comments during opening statement accurately apprised the jury that the State intended to prove that Paul murdered Laneesha and then dismembered her body. The prosecutor's comments also accurately apprised the jury that the State intended to prove that defendant concealed the homicidal death by helping drive the bags containing Laneesha's remains to a bridge on the Little Calumet River where he hoisted the bags out of the trunk and threw them into the river and then cleaned up the crime scene. Accordingly, as all of these comments regarded evidence that was to be proved at trial (and was, in fact, proved) they were a proper subject of opening statement.

¶ 34    Defendant contends that during opening statement, the prosecutor should not have used the adjectives "brutal," "horrific," "gruesome," and "savage" when discussing Laneesha's murder and

defendant's role in concealing it. Defendant contends that "these argumentative terms [were] calculated to invoke an emotional response." The evidence more than bore out the State's references to the murder and to defendant's role in its concealment as being brutal, horrific, gruesome, and savage. As the State's comments were an accurate appraisal of what it intended to prove, and did in fact ultimately prove at trial, we find no reversible error.

¶ 35    Defendant argues that it was error for the prosecutor to reference Laneesha's mutilation during opening statements as he was never specifically charged with dismembering her body. However, the crime with which defendant was charged, concealment of a homicidal death, was achieved *because* Laneesha's body was dismembered and then defendant ensured that her body parts were placed in bags and thrown into the river. Accordingly, as Laneesha's dismemberment and mutilation facilitated defendant's commission of the crime with which he was charged, and as the State intended to prove her dismemberment to the jury in order to show defendant's guilt, the prosecutor committed no reversible error in mentioning Laneesha's mutilation during opening statement.

¶ 36    Defendant also contends that the prosecutor deprived him of a fair trial when he displayed a photograph of Laneesha to the jury during opening statements and referenced her as being "beautiful." We disagree. Prior to trial, the State filed a motion *in limine* seeking permission to display a photograph of Laneesha during its opening statement. The prosecutor explained that the photograph would be a "life photo" that was not prejudicial or inflammatory, and that the State had a good faith basis to believe that the photograph would be admitted into evidence at trial. The court granted the motion. The State subsequently displayed the photograph (which shows Laneesha's smiling face) during its opening statement and the photograph was admitted at trial. As the photograph of Laneesha constituted evidence expected to be admitted at trial, and was in

fact admitted, the State committed no error in displaying the photograph during opening statement. Additionally, the prosecutor's brief reference to Laneesha as being beautiful did not constitute reversible error where the comment was not indicative of deliberate misconduct and did not substantially prejudice defendant.

¶ 37 Next, defendant contends that the trial court erred by admitting the testimony of Laneesha's parents regarding when they each communicated with her prior to her death. Defendant's contention is without merit. The State is entitled to call "life and death" witnesses to establish that the murder victim had been alive prior to the events at issue. *People v. Felder*, 224 Ill. App. 3d 744, 758 (1992). Accordingly, the court did not err by admitting the testimony of Laneesha's mother and father regarding the circumstances and timing of their last communications with Laneesha prior to the events at issue leading to her death.

¶ 38 Defendant argues, though, that the court erred by allowing Laneesha's mother to testify that Laneesha had three children, and to give their names and ages. Defendant cites in support *People v. Hope*, 116 Ill. 2d 265 (1986). In *Hope*, the defendant was given the death penalty, and the pertinent issue on appeal was whether the court erred in allowing the State to introduce evidence at the guilt phase of the trial concerning the family of the deceased victim. *Id.* at 274-75. Our supreme court stated that generally, evidence that a deceased left a family is not relevant to the guilt or innocence of the accused and only serves to prejudice the defendant in the eyes of the jury. *Id.* at 275. Where testimony of the deceased's family is presented in such a manner as to cause the jury to believe that it is material, its admission may constitute reversible error. *Id.* However, the supreme court further noted that "common sense" tells us that murder victims frequently leave behind family members, and therefore not every mention of a deceased's family entitles defendant to a new trial, "particularly *** when the death penalty is *not* imposed."

(Emphasis in original). *Id.* at 275-76. The supreme court examined the evidence and determined that throughout the guilt phase of the trial, the prosecutor made repeated reference to and elicited testimony regarding the decedent's family. *Id.* at 276. Specifically, the prosecutor referenced the decedent's family in the opening statement, questioned the victim's wife about his family and showed her a photograph in which she identified his family members, questioned another witness about the same photograph, and referenced his family in closing argument. *Id.* at 276-77. The supreme court found that the repeated references to the victim's family throughout the guilt phase of the trial were not merely incidental but were made in such a way as to cause the jury to believe that they were material. *Id.* at 278-79. Accordingly, the supreme court vacated the death penalty, reversed the conviction, and remanded for a new trial and sentencing hearing. *Id.* at 279.

¶ 39     The present case, which did not involve the death penalty, is inapposite to *Hope*. Here, Laneesha's mother only briefly testified to the names and ages of Laneesha's children and where they lived. No other witness testified about Laneesha's children. During closing argument, the State briefly referenced one of Laneesha's children, but only to remind the jury how the investigation began:

> "When Laneesha didn't show up in Georgia for her daughter's surgery, her dad called the police. They reported her missing. She wasn't where she was supposed to be, and that's when the investigation began."

¶ 40     There was no mention of Laneesha's children in opening statement or rebuttal argument. On these facts, we find that the brief references to Laneesha's children in her mother's testimony and during the State's closing argument were not so prejudicial as to result in reversible error.

¶ 41     Next, defendant contends that the trial court erred by admitting the autopsy photographs depicting Laneesha's dismembered body parts.

- 13 -

¶ 42     Generally, photographic evidence is admissible and may be shown to the jury if it is relevant to some fact at issue or of consequence. *People v. Tatum*, 2019 IL App (1st) 162403, ¶ 111; Ill. R. Evid. 401 (eff. Feb. 1, 2011). Photographs of a murder victim are admissible to prove the nature and extent of the injuries, or the manner and cause of death, or to facilitate the testimony of a witness such as the medical examiner. *Id.* If photographs can aid the jury in understanding the testimony, they may be admitted even if cumulative of that testimony. *People v. Chapman*, 194 Ill. 2d 186, 220 (2000). The decision whether to allow the jury to see photographs of the decedent rests within the sound discretion of the trial judge. *Id.* at 219.

¶ 43     Here, the autopsy photographs were admitted into evidence during Dr. Arunkumar's testimony, in which she stated that the dismemberment of Laneesha's body was one of the factors leading her to conclude that Laneesha's death was a homicide. Although defendant was not charged with Laneesha's murder, he was charged with concealment of her homicidal death, one of the elements of which is that Laneesha's death was, in fact, a homicide. See 750 ILCS 5/9-3.4 (West 2018). The State is allowed to prove every element of the charged offense and every relevant fact "even though the defendant fails to contest an issue or is willing to stipulate to a fact." *People v. Bounds*, 171 Ill. 2d 1, 46 (1995). Therefore, the autopsy photographs were admissible to facilitate Dr. Arunkumar's testimony and to prove that Laneesha's death was a homicide, which is one of the elements of the charged offense of concealing a homicidal death. See 720 ILCS 5/9-3.4 (West 2018). Accordingly, we find no abuse of discretion in the court's decision to admit the autopsy photographs into evidence.

¶ 44     The autopsy photographs also were admissible to prove another element of the charged crime, that defendant *concealed* Laneesha's homicidal death. At trial, Dara testified that defendant told her that he had helped Paul conceal Laneesha's homicidal death by paying some persons to

help them put her body parts in bags, after which he and Paul dumped the bags in the river. The autopsy photos depicting Laneesha's body parts corroborated Dara's testimony regarding how defendant had acted to conceal Laneesha's homicidal death and were admissible on that basis.

¶ 45   Defendant argues, though, that under Rule 403, evidence may still be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011). Defendant contends that the autopsy photos were so "graphic" as to unfairly prejudice him such that they should have been excluded. This court's review of the autopsy photographs, which are contained in the record on appeal, reveals that the body parts depicted therein are tagged and laying on a flat surface in a clinical fashion and are not bloody. The photographs are as testified to by Dr. Arunkumar; they corroborate her testimony and provide proof of the elements of concealment of a homicidal death and are not so "graphic" such that their probative value was substantially outweighed by the danger of unfair prejudice.

¶ 46   Next, defendant contends that the court erred during closing arguments by allowing the State to use a PowerPoint presentation containing Exhibit 31, which was the photograph that depicted Laneesha's two forearms with attached hands but no upper arms, portions of the feet and attached upper legs, and the buttock area with the attached spine.

¶ 47   The use of exhibits to illustrate a closing argument is within the discretion of the trial court and is generally proper as long as they are not misleading to the jury and are based on facts in evidence. *Martin v. Zucker*, 133 Ill. App. 3d 982, 989 (1985). Here, as discussed earlier in this order, Exhibit 31 was properly admitted into evidence at trial to facilitate Dr. Arunkumar's testimony and to prove that Laneesha's death was a homicide that defendant had helped to conceal and, as such, the court committed no abuse of discretion in allowing the State to use that exhibit

to support its closing argument that it had proved all the elements of concealment of a homicidal death.

¶ 48    Defendant also contends that the prosecutor committed misconduct during his narration of the images in Exhibit 31 by arguing that Laneesha's body was "mutilated," "dismembered," and "in different bags," and that "those pictures corroborate what you heard about what happened to Laneesha." Defendant forfeited review by failing to object. *Enoch*, 122 Ill. 2d at 186. Even if the issue had not been forfeited, though, we would find no reversible error.

¶ 49    A prosecutor is allowed wide latitude during closing arguments, and may comment on the evidence presented at trial, as well as any fair, reasonable inferences therefrom. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005); *People v. Cook*, 2018 IL App (1st) 142134, ¶ 61. Reversal is warranted only if the prosecutor's improper remarks substantially prejudiced defendant, that is, if they constituted a material factor in his conviction. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 50    We note that it is unclear whether the proper standard of review for alleged prosecutorial misconduct in closing arguments is *de novo* or abuse of discretion. *People v. Phillips*, 392 Ill. App. 3d 243, 274-75 (2009). We need not resolve this issue because the outcome here is the same under either standard. As discussed earlier in this order, the evidence at trial, including Exhibit 31, more than supported the prosecutor's remarks that Laneesha's body was mutilated, dismembered and in different bags. Accordingly, the prosecutor's closing argument was not in error.

¶ 51    Next, defendant contends that the trial court erred by admitting Martha Skipper's testimony that she made prior consistent statements to the detectives, an Assistant State's Attorney, and the grand jury that she cleaned the red spots on the floor and wall of Paul's bedroom at defendant's request. See *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 60 (prior consistent statements generally are inadmissible because they unfairly enhance the credibility of the witness). Given all

the evidence against defendant, any error in the admission of Martha's brief reference to her prior consistent statements was harmless where there is no reasonable probability that the jury would have acquitted defendant absent that testimony. *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 65, ¶ 66 (error is harmless where other evidence in the case overwhelmingly supports the conviction).

¶ 52    Defendant argues that the cumulative effect of the various alleged errors requires that he be granted a new trial. There is no reversible error on any individual issue and no cumulative error.

¶ 53    For the foregoing reasons, we affirm the circuit court.

¶ 54    Affirmed.