NOTICE

Decision filed 10/19/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190418-U

NO. 5-19-0418

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 19-CF-98 |
| | ) | |
| JAMARO J. KEMMERLING, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Boie and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We reverse the defendant's convictions and sentences and remand this cause for a new trial because we agree with the defendant that (1) the trial judge abused his discretion when he improperly allowed the admission of other-crimes evidence, (2) the error was not harmless, because the State has not met its burden of persuasion to prove beyond a reasonable doubt that the result would have been the same without the error, and (3) the instructions given to the jury did not cure the error. In addition, we reject, or decline to address, aspects of the defendant's second contention of error, and we reject his third contention of error, which is that the State failed to prove the *corpus delicti* of his convictions. We conclude that principles of double jeopardy do not bar a retrial in this case.

¶ 2   The defendant, Jamaro J. Kemmerling, appeals his convictions, following a trial by jury in the circuit court of Jefferson County, for the offenses of armed violence (two counts) and unlawful possession of a weapon by a felon (one count). For the following reasons, we reverse the defendant's convictions and sentences. Because we conclude that retrial is not barred by principles of double jeopardy, we remand this cause for a new trial.

1

I. BACKGROUND

¶ 4     On February 15, 2019, the defendant was charged, by information, with two counts of armed violence, one count of unlawful possession of weapons by a felon, one count of unlawful possession of a stolen firearm, and two counts of aggravated fleeing or attempting to elude a peace officer. The charges stemmed from an incident on February 13, 2019, in which the defendant allegedly possessed a firearm while recklessly driving a vehicle in an attempt to flee from police officers who were pursuing him in their vehicles. The defendant was not observed with a firearm during the pursuit, and was not alleged to have discharged a firearm during the pursuit.

¶ 5     On February 22, 2019, the defendant was indicted on the same charges. On May 15, 2019, the State filed motions *in limine* to admit prior criminal convictions of the defendant, pursuant to the provisions of the Illinois Rules of Evidence. On May 21, 2019, the defendant filed a motion *in limine* to bar the State from eliciting hearsay testimony that law enforcement authorities had received information that the defendant "was carrying a large silver revolver-like cowboy gun" at the time of the alleged offenses.

¶ 6     A hearing on the motions was held on June 19, 2019. With regard to the defendant's motion, defense counsel argued, *inter alia*, that allowing hearsay evidence that the police were seeking the defendant because they were informed that he had a gun would be "extremely prejudicial" to the defendant, and was not necessary to understand the course of events that led to the defendant's arrest and the charges for which he was to be tried. He did not argue specifically that if the police were allowed to testify that they believed the defendant possessed a firearm, they nevertheless should not be allowed to testify as to any details about the firearm they believed he possessed, such as that they believed it was a "silver revolver." The State countered that the evidence in question was not hearsay because it was not being offered for the truth of the matter

asserted—that the defendant had a gun—but was being offered to explain why the police were searching for, then pursuing, the defendant at the time of the alleged offenses. The trial judge ruled in favor of the State, finding that the evidence in question was not hearsay because it was not being offered for the truth of the matter asserted, and further ruled that the evidence was not unduly prejudicial. He also ruled that if an officer were to testify that the officer drew his gun when arresting the defendant because the officer believed the defendant had a gun, such testimony would be permissible, because it simply provided background information about the arrest and did not "prove that [the defendant] had a gun."

¶ 7    With regard to the State's motions, the parties agreed to leave pending—or reserve—the motion that would become relevant only if the defendant chose to testify, which, as it turned out, he chose not to do. With regard to the other motion, the State clarified that its motion was for the admission of "prior bad acts, of which convictions can be a subset." Specifically, the State argued that it wished to introduce evidence of the circumstances surrounding the defendant's 2016 arrest and conviction for residential burglary, because the defendant possessed a gun when performing the burglary. The State expounded as follows:

> "The State would be seeking to admit this not for propensity evidence but rather absence of mistake, that when [the defendant] commits bad behavior he is armed with a firearm. That he intended to be armed with a firearm at this instance. That he—it goes to show his *modus operandi*. And that whenever he is committing felonious acts or otherwise bad acts, that he does arm himself with a firearm. Simply put, we're not trying to use this evidence to show that well, because he had a firearm on that day that he must always have a firearm but rather whenever he is up to criminal behavior he typically and intentionally has a firearm."

3

¶ 8    The State further argued that it wished to introduce evidence of the circumstances surrounding the defendant's 2016 arrest and conviction for attempted possession of a firearm, again to show "*modus operandi*, intent, and absence of mistake." The State argued that this evidence was important to the present case because the evidence in the present case would show that the gun in question was not recovered at the time or place the defendant was arrested for attempting to elude police, but was recovered during a subsequent search of the area after police learned from a jail telephone call recording of the defendant that he may have discarded the gun during the pursuit.

¶ 9    Finally, the State argued that it wished to introduce evidence of the circumstances surrounding a January 2019 incident in which the defendant allegedly stored firearms at a home at which he was staying. The State once again argued that this evidence would not be offered to show propensity, but would be offered to show intent, *modus operandi*, and absence of mistake. The State argued that the evidence would show that the defendant was "intentionally putting himself in positions where he does possess firearms," which was "exactly what we have in the case at hand."

¶ 10    Defense counsel argued that, *inter alia*, introducing evidence of "two prior serious felony convictions" would be unduly prejudicial to his client, because it would go directly to the question of propensity to commit crimes with guns. He further argued that the evidence would not be related at all to *modus operandi*, absence of mistake, or intent. He added that he was willing to stipulate to the defendant's prior felony convictions, which he believed would remove any need for the evidence to be presented in the manner desired by the State.

¶ 11    The trial judge ruled that evidence of the defendant's two felony convictions was "more probative than prejudicial," and was "relevant" for the reasons argued by the State. He ruled that,

4

accordingly, evidence of the convictions was admissible. With regard to evidence of the circumstances surrounding the January 2019 incident in which the defendant allegedly stored firearms at a home at which he was staying, he ruled that because there was no criminal conviction related to that incident, he would not allow evidence about it. Thereafter, the parties and the judge agreed that count III contained a scrivener's error, and it was therefore amended to charge "unlawful possession of a weapon by a felon" rather than "unlawful possession of weapons by a felon," due to the fact that only one weapon was alleged to be involved in this case.

¶ 12    On June 25, 2019, the defendant's jury trial began. At the outset of the trial, outside the presence of the jury venire, the State moved to "nolle pros" the count alleging possession of a stolen firearm, because it did not wish to attempt to prove that the defendant knew the firearm was stolen. After the jury was selected, and opening statements were given, the State moved to admit a certified copy of the defendant's 2016 criminal convictions for residential burglary, and for attempted possession of a firearm. It was admitted over the objection of the defense.

¶ 13    The first witness to testify for the State was Jeff Bullard, who testified that he was the Sheriff of Jefferson County, and previously was a detective captain with the Mt. Vernon Police Department. He testified, over the objection of the defense, that in June 2016, while employed by the Mt. Vernon Police Department, he assisted with the investigation of a residential burglary in which it was determined that the defendant was one of two individuals who "forced entry into [the victim's] residence armed with handguns." He testified that when he thereafter helped to execute a search warrant of the defendant's home, three handguns were located there, all hidden in various parts of the home. He then authenticated the certified copy of the defendant's two convictions from that incident. He agreed that the convictions stated therein were for residential burglary and attempted possession of a firearm, and further agreed that it would "be fair to say" that during the

5

investigation they learned that the defendant possessed a firearm. The State did not question Bullard at all about the offenses for which the defendant was standing trial.

¶ 14    The next witness to testify was Jeremiah Johnston, who testified that he was a detective with the Mt. Vernon Police Department. He testified that on February 13, 2019, he and Detective Haney received information that the defendant, whom they knew to have an active arrest warrant, "would be traveling around Mt. Vernon, possibly driving a blue passenger car." He testified that he and Detective Haney set out to find the defendant, and located a vehicle matching the description they had received. He testified that they identified the defendant as the driver of the vehicle, and the defendant's brother, Leon, as a passenger. Johnston testified that they attempted to make a traffic stop, using their unmarked squad car's emergency lights and siren, but that the defendant's vehicle "slowed down, the rear passenger door actually opened for a short time, and then the vehicle sped off." He testified that they pursued the vehicle until they lost sight of it, at which time, in accordance with police department policy, they terminated their pursuit. He testified that subsequently, another detective located the vehicle "stuck in a driveway or yard," with two men walking away from it. He testified that he and Detective Haney reached the area and observed the men, who were the defendant and his brother, Leon. He testified that the two men were taken into custody and transported to the county jail. He testified that during the pursuit, the defendant failed to stop at a total of five stop signs.

¶ 15    On cross-examination, Johnston agreed that the defendant and Leon were walking, rather than running, when arrested, that they were arrested without incident, and that no weapons or narcotics were recovered from the two men. On re-direct examination, he testified that when he ordered the defendant to the ground prior to arresting him, he first drew his service weapon and

6

pointed it at the defendant, which might have explained why the men were arrested without incident. He was not asked if he believed the defendant was armed.

¶ 16    Joshua Clarke testified that he was a patrol officer with the Mt. Vernon Police Department, and that on February 13, 2019, he was aware that detectives were looking for the defendant. He testified that he was called to assist the detectives in their traffic stop, and that he spotted the defendant's vehicle after the detectives lost sight of it, but that he too was unable to stop the vehicle, because the defendant was driving erratically and unsafely, nearly hitting a school bus, at which point Clarke decided to terminate his pursuit of the defendant. He testified that school had just been released for the day, and there were kids present in the area. He authenticated, *inter alia*, a DVD copy of a video from his squad car's camera systems. The DVD was played for the jury, without objection from the defendant. The video from Clarke's squad car's forward-facing dashboard camera showed the pursuit, while subsequent video from a different part of the camera system showed the defendant being placed in the back of Clarke's squad car after the defendant's arrest. Clarke thereafter authenticated still-frame photographs taken from some of the video footage. He testified that he could not recall if the defendant was wearing shoes at the time the defendant was arrested. He testified that he believed the still-frame photographs of the man driving the vehicle, and of the man arrested and placed in the back of his squad car, were both still-frame photographs of the defendant.

¶ 17    Nicholas Craig Mansker testified that he was the assistant jail administrator for the Jefferson County Sheriff's Office. He testified that he administered the security and surveillance systems at the jail, which included video monitoring and audio monitoring systems "throughout the facility." He testified with regard to the process by which outgoing phone calls from inmates at the jail are recorded, as well as how records of those calls are maintained and stored, and about

7

how video footage is recorded and stored. He identified the defendant, and authenticated video and audio recordings of contacts the defendant had with others while the defendant was incarcerated at the jail. The recordings were admitted into evidence, but were not published to the jury during Mansker's testimony.

¶ 18    Trent Page testified that he was the chief of the Mt. Vernon Police Department, and that on February 13, 2019, he was involved in an investigation of the defendant, who he identified in court. Chief Page testified that when the defendant's abandoned vehicle was located on that date, he went to the scene, and requested permission to search the vehicle for a weapon. He did not testify as to why he believed there might be a weapon in the vehicle. The owner of the vehicle, who was not the defendant or his brother, gave written consent and a search was conducted. No weapon was recovered from the vehicle. Chief Page testified that officers then searched the area between the abandoned vehicle and where the defendant and his brother were apprehended, which was a short distance away, but did not find a weapon. He testified that later that day, he received information from Detective Haney that a weapon may have been thrown from the car, so another search was conducted, but no weapon was found.

¶ 19    Chief Page testified that on the following day, February 14, 2019, Detective Haney informed him that he had received more detailed information about where the weapon may have been discarded, specifically that it was discarded in what was being called a "swoop alley." He testified that officers began analyzing the route of the pursuit, and eventually agreed upon the probable location of the swoop alley, based upon the fact that most other alleys in that area were fairly straight and did not "swoop" in any direction. He testified that officers thereafter searched the area and located a handgun in "[h]eavy vegetation" in the alley, near tire marks that he believed indicated "a vehicle coming to a rapid stop." He authenticated various photographs of the area of

8

the search, as well as of the handgun, which were admitted into evidence and published to the jury. Chief Page testified that the police department's crime scene technician collected the handgun and processed it. On cross-examination, Chief Page conceded that he did not know how long the handgun had been in the vegetation prior to it being discovered.

¶ 20    Robert Brands testified that he was the assistant chief of police of the Mt. Vernon Police Department, and that on February 14, 2019, while searching the alley area with other officers, he found the handgun in question, which he described as "a silver revolver." He testified that he did not find any other guns in the area. On cross-examination, he conceded that during a search of the same area, "just a few minutes prior," no gun had been found. He further conceded that he did not know how long the handgun had been in the vegetation prior to his discovery of it.

¶ 21    Justin Haney testified that he was a corporal with the Mt. Vernon Police Department, and that in February 2019, he was a detective. He identified the defendant in court, and testified that he was involved in an investigation of the defendant. He testified that he received information that the defendant was in possession of a silver revolver. Defense counsel objected to Haney's testimony on the basis that it was hearsay. The State contended that it was not presenting the testimony to prove the truth of the matter asserted—that the defendant possessed a silver revolver—but was instead presenting it to help the jury understand why Haney was investigating the defendant, and why Haney believed the defendant had a gun. Defense counsel's objection was overruled.

¶ 22    Haney's testimony about searching for, locating, pursuing, and eventually apprehending the defendant was consistent with the testimony of Detective Johnston. In addition, Haney testified that on February 14, 2019, he "listened to a jail call placed from the defendant to his girlfriend *** who I had spoken to the day prior, the vehicle—the owner of the vehicle he was driving." He

9

testified that during the call, the defendant asked his girlfriend "to contact her brother, J.R., and to have J.R. go to what he called the swoop alley *** and check near the last tree in the swoop alley for his football because he left his football there, and he asked her brother to retrieve it." A recording of the phone call, as well as an accompanying printed transcript, both of which had previously been admitted into evidence, as described above, were then published to the jury.

¶ 23 Thereafter, Haney testified that the recording and transcript reflected the phone call he listened to on February 14, 2019. He testified about the search that led to the discovery of the handgun. He was then presented with People's Exhibit number 16, which he authenticated as "the Rossi handgun that was recovered at the scene, including the cartridges that were found in the cylinder, five live cartridges and one spent shell casing." He testified that the gun was "a real firearm" and that the cartridges were "real cartridges." He testified that he subsequently checked the serial number of the handgun and discovered that it was "reported stolen from a burglary case that occurred at A&S Gunsmith in Mt. Vernon years prior." He testified that he turned the handgun over to the police department's crime scene technician for processing. The gun was then admitted into evidence and published to the jury.

¶ 24 Haney testified that his involvement in the case continued, and that he "overheard a jail call on February 19, 2019, between the defendant, his mother, and his *** stepfather in which his stepfather asked him about the allegations that were made in a news article or in the charges about him having a weapon at the time." Haney testified that the defendant stated, " 'I had the shoes on me when they started chasing me, but then I—I took the shoes off, and they were far away from where they got me.' " A recording of the phone call, as well as an accompanying printed transcript, both of which had previously been admitted into evidence, as described above, were then published to the jury. Haney subsequently testified that the defendant had shoes on when the defendant was

10

arrested. Thereafter, a video recording of a February 14, 2019, visit at the jail between the defendant and his mother, as well as an accompanying printed transcript of the discussion between the two of them, both of which had previously been admitted into evidence, as described above, were then published to the jury. During the visit, the two discussed the charges against the defendant, with the defendant's mother opining that the defendant was charged with aggravated eluding simply because he had not been caught during the pursuit, and with the defendant agreeing with this proposition.

¶ 25 On cross-examination, Haney agreed that he did not ever see the defendant fire the handgun, that no gun was discovered during the searches conducted on February 13, 2019, that no gun was discovered in the vehicle driven by the defendant, and that no gun was discovered on the defendant's person when he was arrested. He testified that the area where the gun was eventually found was "several blocks away" from the area that was searched on February 13, 2019, and that he did not search the area where the gun was found until February 14, 2019. He testified that he did not know how long the gun had been in the location in the vegetation where it was found.

¶ 26 Following Haney's testimony, the State rested its case. The defendant made a motion for a directed verdict, which was denied, with the trial judge noting that although he believed it was clear that this case involved circumstantial evidence, the State's evidence, viewed in the light most favorable to the State, was sufficient to withstand the defendant's motion. The defense then rested as well, without presenting any evidence. The trial judge admonished the defendant to ensure that the defendant understood that he had "an absolute right to testify" and was voluntarily relinquishing that right. The defendant agreed that he did, and that he was. The jury was subsequently instructed, and closing arguments followed thereafter.

11

¶ 27 With regard to the charge of unlawful possession of a weapon by a felon, counsel for the State argued as follows:

"I want to briefly discuss that conviction because that's all it is. It's an element of the offense, and I'm not going to talk again about it because that's all it is. It makes that possession of that firearm illegal for that count. It also is to be considered for the very limited purpose of illuminating the defendant's intent to possess a firearm, the history with firearms, and also to illuminate and cut against the argument that it's a mistake that they found a gun there believing that it belonged to the defendant. It cuts against the argument that that's a mistake or coincidence that, lo and behold, they found this where they were looking for something belonging to him, and that's all I'll say about that."

¶ 28 Counsel then moved on to discussing the trial testimony of the various police officers, although he did not mention, at all, Sheriff Bullard's testimony about the events surrounding the defendant's prior convictions. He also argued that it was clear, from the overall context of the case, that the defendant's telephone call references to his "football" and to his "shoes" were in fact references to the gun he had disposed of in the vegetation during the pursuit.

¶ 29 Defense counsel argued that, *inter alia*, there was "no proof *** whatsoever" that the defendant ever possessed the gun that the police later found, which was important because to prove the serious felony charges of armed violence and of aggravated fleeing or attempting to elude a peace officer, the State had to prove beyond a reasonable doubt that the gun was, during the pursuit, in the car with the defendant. With regard to the defendant's status as a felon, and the fact that the jury must not hold that status against the defendant, counsel reminded the jurors that during *voir dire*, "[a]ll 14 of you, every one of you, I remember vividly said that's just a fact; that you, all

12

14 of you, before you would ever, ever sign a guilty verdict that you would require the State to prove all of the elements beyond a reasonable doubt."

¶ 30 Following closing arguments, at approximately 2:10 p.m., the jury retired to deliberate. Approximately one hour later, the jury sent a note to the trial judge that stated, in its entirety, as follows: "paper copies phone conversations Det. Johnstons transcript of testimony." The parties and the trial judge agreed to respond to the note with the following information:

"You will be brought back into the courtroom to once again listen to the two phone conversations and to simultaneously review their respective transcripts in the courtroom. The transcripts are admissible only as an aid in listening to the audio recordings. *** Detective Johnston's testimony has been presented to you for your deliberations. A transcript of it does not exist."

¶ 31 The jury was then brought back to the courtroom, and before the phone conversations were played again, the trial judge re-instructed the jury as follows:

"Electronic recordings have been admitted into evidence. In addition to the electronic recordings themselves you are being given transcripts of the electronic recordings. The transcript only represents what the transcriber believes was said on the electronic recordings and merely serves as an aid when you listen to the electronic recordings. The electronic recordings and not the transcripts are the evidence. If you perceive a conflict between the recordings and the transcripts, the recordings control."

¶ 32 At approximately 4:10 p.m., the jurors notified the trial judge that they had reached a verdict. The jury found the defendant guilty of all five counts upon which he was tried: two counts of armed violence, one count of unlawful possession of a weapon by a felon, and two counts of aggravated fleeing or eluding a peace officer.

13

¶ 33    On July 25, 2019, the defendant filed a motion to vacate his convictions and grant him a new trial, in which he argued that (1) the trial judge abused his discretion when he allowed evidence of the defendant's prior convictions, because "the defendant offered to stipulate he was a felon," and (2) the evidence of the prior convictions was used to show propensity "and did not fit the exceptions[,] nor was it necessary given the State's theory of the case." The defendant did not raise any hearsay or confrontation clause arguments in his posttrial motion. On July 26, 2019, the State responded to the defendant's motion.

¶ 34    On October 3, 2019, a hearing on the motion and the State's response was held, followed immediately by the defendant's sentencing hearing. At the outset of the hearing, the State suggested, and defense counsel and the trial judge agreed, that the counts of aggravated fleeing or eluding a peace officer were "predicate felonies" of the armed violence counts, and thus merged with them for purposes of convictions and sentences. With regard to the defendant's motion, the trial judge ruled that "regardless of stipulations [by the defense,] the State has a right to put on evidence to establish its case," and that the evidence allowed at trial was properly admitted because the trial judge continued to believe that it was "more probative than prejudicial." Accordingly, the trial judge denied the defendant's motion.

¶ 35    The trial judge then turned to the matter of sentencing the defendant for the two counts of armed violence and one count of unlawful possession of a firearm by a felon. The State requested concurrent sentences on the three convictions, specifically 25 years of imprisonment in the Illinois Department of Corrections (IDOC) for each count of armed violence, and 14 years of imprisonment in IDOC for the count of unlawful possession of a firearm by a felon. Defense counsel requested a total term of imprisonment of 15 years, the minimum permissible by statute. The trial judge sentenced the defendant to 20 years in IDOC on each count of armed violence, and

14

10 years in IDOC on the count of unlawful possession of a firearm by a felon, with the sentences to be served concurrently and followed by a term of mandatory supervised release. This timely appeal was filed the following day. Additional facts will be provided as necessary throughout the remainder of this order.

¶ 36                                            II. ANALYSIS

¶ 37     On appeal, the defendant contends the trial judge erred by admitting into evidence (1) the names and details of the defendant's two prior felony convictions and (2) testimony that the police had received information that the defendant was in possession of a silver revolver, in a specific car, and with a warrant for his arrest, because all of this information was based on hearsay, and further because "none of this testimony was subject to cross[-]examination" and thus presented confrontation clause problems. As an additional claim of error, he contends that the State failed to prove the *corpus delicti* of his convictions because the "only evidence of firearm possession was [the defendant's] own statements."

¶ 38     With regard to his first contention, the defendant contends that the trial judge abused his discretion when he allowed into evidence the names and details of the defendant's two prior felony convictions because defense counsel stated multiple times prior to and during the trial that the defense was willing to stipulate that the defendant was a felon, and because the evidence constituted improper propensity evidence. He notes Illinois case law in support of his position, acknowledges limitations of that case law, and further argues, in support of his propensity contentions, that "it was error to name the specific felonies and provide detailed descriptions of the prejudicial, inflammatory details of the felonies," and error to allow "a police officer [to] read certified dispositions with the names of the convictions, the dates of conviction, and to enter the certified dispositions into evidence." He provides detailed argument as to why he believes the

15

evidence was not proper evidence of *modus operandi*, motive, intent, knowledge, or absence of mistake. He argues that the purported errors were not harmless, were not cured by any of the instructions given to the jury, and in fact were prejudicial to him.

¶ 39   With regard to his second contention, the defendant contends that the trial judge erred in allowing testimony that the police had received information that the defendant was in possession of a silver revolver, in a specific car, and with a warrant for his arrest, because the "testimony was unnecessary to explain why the police came into contact with [the defendant] and did not fall under the investigatory procedure exception to hearsay," as well as because the "testimony was particularly prejudicial as the anonymous tip about the silver revolver was the exact type of weapon the police found in the brush and charged [the defendant] with possessing." He further argues that "none of this testimony was subject to cross[-]examination" and thus presents confrontation clause problems. He contends that these purported errors are preserved, or, if not preserved, should be reviewed as plain error or as ineffective assistance of trial counsel. He posits that the testimony was unnecessary "because Detective Haney also testified he saw [the defendant] commit a traffic infraction and based on that activated his emergency lights to stop him," and that, accordingly, "[a]ny information beyond this traffic infraction, including the tip and the parole warrant, was unnecessary to explain" why officers attempted to stop the defendant. He further contends that "[i]f more information were needed, it should have been limited to the police testifying they acted upon information received[,] not providing specific details." He also argues that "even if the parole warrant testimony was appropriate, this completely negates the need for the testimony about the silver revolver." He provides case law in support of his various points regarding this issue.

¶ 40   With regard to his third and final contention, the defendant contends that the State failed to prove the *corpus delicti* of his convictions because the "only evidence of firearm possession was

16

[the defendant's] own statements," and because "there was insufficient evidence to corroborate" the defendant's statements. He posits that "[m]erely being in the general area where the firearm was located is insufficient," and that even if the jury believed the testimony of police—and the video and photo evidence from police car camera systems—that the defendant was the person driving the car being pursued by the police, "this was only corroboration for the speeding and disobeying traffic signals[,] not for possessing the firearm," which was not found in the car or on the person of the defendant.

¶ 41    The State responds in its brief on appeal by arguing that there was no abuse of discretion with regard to the defendant's first claim of error because although the defendant is correct that it is an abuse of discretion for a trial judge to admit the name and nature of a defendant's prior felony convictions if the only purpose for doing so is to inform the jury of the defendant's status as a felon and the defendant has offered to stipulate to that status, in this case there was a permissible alternative reason to admit that information: to prove *modus operandi*, motive, and intent. The State does not provide specific argument justifying the evidence under Illinois case law involving the admissibility of evidence to prove *modus operandi*, motive, or intent, but argues that the evidence of the defendant's prior convictions did not impermissibly become the focus of the defendant's trial in this case because Sheriff Bullard's testimony was a small part of the trial. The State further argues that counsel for the State was correct at trial that "the convictions were presented for [legitimate] evidentiary reasons" because "[t]he defendant was consistently armed in the past while engaging in criminal activity and the State wanted to illustrate this to the jury," and because "Bullard's testimony and the copies of convictions were not utilized as proof solely that the defendant has a propensity to commit crime, but rather that the defendant has a consistent history and pattern of being armed while in the commission of offenses." Accordingly, the State

17

claims there was no error in this case. The State further contends that even if admission of the evidence was in error, this court should find that the error was harmless because it was unlikely to have influenced the jury, and was cured by the jury instructions given by the trial judge. The State argues that in this case, "[t]he disputed issue was the defendant's possession of a firearm which was conclusively proven by the defendant's phone call" statements.

¶ 42     With regard to the defendant's second claim of error, the State responds that this claim is forfeited because none of these issues were included in the defendant's posttrial motion, and therefore the claim is not reviewable as plain error because "the evidence was not closely balanced due to the State's strong reliance on the defendant's telephone admission." The State further argues that there was no hearsay, because Detective Haney's testimony was not being offered to prove the truth of the matters asserted: that the defendant was in possession of a silver revolver, in a specific car, and with a warrant for his arrest. Instead, "Haney was outlining the progressive steps of his investigation." The State contends that even if there was error, or ineffective assistance of counsel, the defendant was not prejudiced thereby, because the evidence was not closely balanced.

¶ 43     With regard to the defendant's third and final claim of error, the State contends that there was sufficient evidence to corroborate the defendant's statements and to therefore prove the *corpus delicti* of the offenses in question. The State notes that in Illinois, "[t]he *corpus delicti* rule requires only that the corroborating evidence correspond with the circumstances recited in the confession and tend to connect the defendant with the crime," and that the corroborating "evidence need not precisely align with the details of the confession on each element of the charged offense, or indeed to any particular element of the charged offense." The State posits that the defendant's telephone call statements provided "direction to verifiable geographic areas that resulted in the finding of a weapon," and that because the evidence showed that the police were able to use those

18

statements "in conjunction with video footage from the squad cars" and other information they knew about the pursuit "to locate a specific alley which matched with the defendant's phone call description" and led them to "the vegetation in that alley where the weapon was found," the corroborating evidence in this case was sufficient to prove "that the defendant, while being pursued, was in possession of the gun."

¶ 44    In his reply brief, the defendant contends that the State's failure in its brief to address Illinois case law regarding when other-crimes evidence is admissible to show *modus operandi*, motive, or intent is telling, and he reiterates his position with regard to this case law. He argues that the State's "rationale essentially admits that the only reason to put this prejudicial information before the jury was to argue that because [the defendant] possessed a gun in the past he possessed one here." He argues that far from being "admissions" that supplied strong and conclusive evidence of the defendant's guilt, the phone call statements played for the jury contained only "ambiguous language about a football and shoes," which, as the defendant previously noted in his opening brief, could have referred to contraband other than a weapon, including contraband that may have been discarded by the defendant and recovered by a third party prior to the police locating the handgun. With regard to his second argument, he contends that the State's brief "fails to rebut that all the police needed to testify was that they were acting upon information received or that they saw [the defendant] commit a traffic infraction and initiated a traffic stop." He posits that "police testimony beyond this was unnecessary and prejudicial." With regard to his third argument, he reiterates the position taken in his opening brief, claiming the State has provided nothing to refute that position.

¶ 45    Having summarized the positions of the parties on appeal, we now turn to the case law that is relevant to each position. As the parties agree, the Illinois Supreme Court has held, in alignment

19

with precedent from the United States Supreme Court, that a trial judge commits an abuse of discretion if that judge permits evidence of the name and nature of a defendant's prior felony convictions if the *only* purpose for doing so is to inform the jury of the defendant's status as a felon and the defendant has offered to stipulate to that status. *People v. Walker*, 211 Ill. 2d 317, 338-41 (2004) (citing *Old Chief v. United States*, 519 U.S. 172 (1997)). In this case, it is clear from the record that defense counsel unequivocally offered to stipulate to the defendant's status as a felon so that the name and nature of the defendant's prior felony convictions would not be disclosed to the jury. Accordingly, the admission of the evidence about the name and nature of the prior convictions, and about the details surrounding those convictions, was permissible, and not an abuse of discretion on the part of the trial judge, only if the evidence was admissible for other purposes in this case.

¶ 46    In the trial court, and on appeal, the State has insisted that the evidence was admissible to show *modus operandi*, motive, lack of mistake, or intent, all of which are recognized exceptions to the general prohibition of other-crimes evidence. On appeal, however, the State has provided virtually no analysis of the case law related to each of these exceptions, and has put forward virtually no argument with regard to how that case law could support the trial judge's decision in this case. We now examine that case law.

¶ 47    "Evidence of crimes for which a defendant is not on trial is inadmissible if relevant merely to establish the defendant's disposition or propensity to commit crime." *People v. Manning*, 182 Ill. 2d 193, 213 (1998). Other-crimes evidence "is objectionable not because it has little probative value, but rather because it has too much," and "overpersuades a jury, which might convict the defendant only because it feels that defendant is a bad person who deserves punishment." *Id*. at 213-14. As the Illinois Supreme Court has long recognized, "[t]he law distrusts the inference that

20

because a person has committed other crimes, he or she is more likely to have committed the current crime. 'And so, as a matter of policy, where the testimony has no value beyond that inference, it is excluded.' " *Id*. at 214 (quoting *People v. Lehman*, 5 Ill. 2d 337, 342 (1955)).

¶ 48　However, evidence of other crimes is admissible for purposes other than to show a defendant's propensity to commit crimes, such as to show motive, intent, identity, lack of mistake, or *modus operandi*. See, *e.g.*, *People v. Illgen*, 145 Ill. 2d 353, 364-65 (1991). This principle is codified in Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011), which states, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith except as provided by [certain statutes]. Such evidence may also be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Even when the evidence is offered for a permissible purpose, courts generally prohibit the admission of other-crimes evidence if its prejudicial effect substantially outweighs its probative value. *Illgen*, 145 Ill. 2d at 365.

¶ 49　To be admissible, the other-crimes evidence must have some threshold of similarity to the charged crimes. *People v. Donoho*, 204 Ill. 2d 159, 184 (2003). In most cases, general areas of similarity are sufficient for other-crimes evidence to be admissible for purposes other than propensity. *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 36. As the factual similarities between the two crimes increase, so does the relevance or probative value of the other-crimes evidence. *People v. Bartall*, 98 Ill. 2d 294, 310 (1983). Once a trial judge finds some relevance in the other-crimes evidence, the judge must conduct a balancing test to determine whether its probative value is substantially outweighed by its prejudicial effect. *People v. Pikes*, 2013 IL 115171, ¶ 11. The determination of whether the other-crimes evidence should be admissible is not dependent on whether the evidence is prejudicial, as the evidence is unquestionably prejudicial to a defendant.

21

*People v. Perez*, 2012 IL App (2d) 100865, ¶ 45. Instead, the concern is that the prejudice is undue or unfair or of the type that would lure the factfinder into finding defendant guilty on a different ground than from the specific proof presented on the charged offense. *People v. Maya*, 2017 IL App (3d) 150079, ¶ 66. We review the admission of other-crimes evidence for an abuse of discretion. *Donoho*, 204 Ill. 2d at 182. An abuse of discretion is found where the trial judge's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial judge's view. *Id*.

¶ 50    In this case, as the defendant correctly notes, at no point in the trial court or on appeal has the State argued with specificity how the evidence in this case fits the requirements of *modus operandi* evidence. It does not. When other-crimes evidence is submitted for the purpose of establishing a defendant's *modus operandi*, there must be a higher degree of similarity between the facts of the charged offense and the other offenses. *Littleton*, 2014 IL App (1st) 121950, ¶ 36. In particular, the State must show a high degree of identity between the facts of the charged crime and the other offense; they must share distinctive common features as to earmark both acts as the acts of the same person. *Id*. Indeed, *modus operandi* refers to a pattern of criminal behavior that is so distinct that the other crime is recognized as the work of the same person. *People v. Kimbrough*, 138 Ill. App. 3d 481, 486 (1985). Thus, there must be a clear connection between the other crime and the crime charged which creates a logical inference that if the defendant committed one of the acts, he may have committed the other act. *Id*. That said, even where the evidence is offered to prove *modus operandi*, there will be some differences between the crimes. *Id*. at 487.

¶ 51    The defendant is correct that in this case, the level of similarity between his prior convictions and the charged conduct for which he was being tried was low, because, *inter alia*, the prior convictions did not involve the same gun, victim, or any distinctive commonalities. As

22

Sheriff Bullard testified to the jury, the defendant's two prior crimes were (1) a residential burglary in which it was determined that the defendant was one of two individuals who "forced entry into [the victim's] residence armed with handguns," and (2) attempted possession of a firearm, which resulted from the subsequent search of the defendant's home, at which three handguns were located, all hidden in various parts of the home. The charges for which the defendant was being tried involved the factual allegation that while unlawfully in possession of a firearm, the defendant drove a vehicle in a reckless manner in an effort to elude police. Other than the fact that a firearm—but not the same firearm—was alleged to be involved in both sets of offenses, there was virtually no similarity between the crimes at all. Firearms, unfortunately, are involved in all kinds of crimes, and to allow the presence of a firearm that was different from the firearm used in the previous crimes, without more, to be used as evidence to demonstrate *modus operandi* would be contrary to literally decades of case law, as well as contrary to the plain meaning of such terms, used in that case law, as "high degree of identity between the facts of the crime charged and the other offense" (internal quotation marks omitted) (*Littleton*, 2014 IL App (1st) 121950, ¶ 36), "distinctive common features as to earmark both acts as the handiwork of the same person" (internal quotation marks omitted) (*id.*), "a pattern of criminal behavior so distinct that separate crimes *** are recognized as the work of the same person" (*Kimbrough*, 138 Ill. App. 3d at 486), and "clear connection between the other crime and the crime charged which creates a logical inference that if [the] defendant committed one of the acts, he may have committed the other act" (*id.*). Accordingly, the other-crimes evidence in this case did not qualify as evidence of *modus operandi*, and to the extent it was admitted for that purpose, an abuse of discretion occurred.

¶ 52 Likewise, when other-crimes evidence is submitted by the State to show motive, the trial judge must remain mindful of the fact that "[t]he motive exception to the general ban on other-

23

crimes evidence arises in the context of other crimes that serve as the motive behind the crime charged." *People v. Lenley*, 345 Ill. App. 3d 399, 407 (2003). The defendant is correct that in this case, there was no allegation—and absolutely no evidence presented that would have supported such an allegation, had one been made—that the defendant's prior convictions, which we reiterate were from incidents in 2016, provided a motive for the charged crimes that allegedly occurred on February 13, 2019. Accordingly, the other-crimes evidence in this case did not qualify as evidence of motive, and to the extent it was admitted for that purpose, an abuse of discretion occurred.

¶ 53     With regard to lack—sometimes referred to in the case law as absence—of mistake, this court held in *Lenley* that "[t]he admission of other-crimes evidence to show an absence of mistake on a defendant's part arises when the defendant claims that his otherwise criminal acts were the result of a mistake." *Id*. at 408-09. It is only relevant when a defendant claims a mistake, such as a defendant charged with theft who claims he mistakenly believed he was on property he had permission to be on, and had permission to borrow the things he allegedly stole. *Id.* at 409. In this case, as the defendant correctly notes, the defense theory at trial was that the State could not prove that the defendant ever possessed the Rossi revolver later recovered by police, not that he possessed it but did so unintentionally, unknowingly, or accidentally and by mistake. Indeed, the defendant put on no defense at all, and argued only that the State had not met its burden of proving that the defendant possessed the gun. Thus, there was no claim of mistake in this case.

¶ 54     Likewise, with regard to intent, this court held in *Lenley* that "[t]he intent exception to the general ban on other-crimes evidence arises in the context of defenses that challenge the intent, or the state of mind, with which the defendant commits some act." *Id*. at 407. We further held that if a defendant has not placed intent into question, it is error to allow other-crimes evidence to show intent. *Id.* Other courts have disagreed, and have held that other-crimes evidence is admissible to

24

show intent even if a defendant has not placed intent at issue. See, *e.g.*, *People v. Davis*, 2019 IL App (1st) 160408, ¶¶ 57-69.

¶ 55    However, even if we were to accept that basic premise, rather than the premise we put forth in *Lenley*, we would agree with the defendant that in this case, the connection between the 2016 convictions in which the defendant (1) committed a residential burglary as one of two individuals who "forced entry into [the victim's] residence armed with handguns," and (2) committed attempted possession of a firearm because a search of his home turned up three hidden handguns, and the 2019 charges for which the defendant was being tried (which, as stated above, involved the factual allegation that while unlawfully in possession of a firearm, the defendant drove a vehicle in a reckless manner in an effort to elude police) was too tenuous to show that the former convictions were relevant to showing lack of mistake, or intent, for the latter charges. See, *e.g.*, *Donoho*, 204 Ill. 2d at 184 (to be admissible, the other-crimes evidence must have some threshold of similarity to the charged crimes).

¶ 56    There is simply no logical connection—other than, perhaps, a propensity to commit crimes while armed with a firearm—between the defendant's prior convictions and his intent, mistake, or lack of either, with regard to the charges for which he was being tried, which arose approximately three years later. Indeed, the State's argument, in its own language at trial and on appeal, is that the prior convictions and the current charges were "reflective of a pattern where he utilized a firearm," and showed that "when he engaged in criminal activity he was regularly armed," and that, accordingly, the prior convictions were admissible to show intent and lack of mistake because "[t]he defendant was consistently armed in the past while engaging in criminal activity and the State wanted to illustrate this to the jury," which the State claims was done, via Sheriff Bullard's testimony and the certified copy of convictions, in a manner that properly showed "that the

defendant has a consistent history and pattern of being armed while in the commission of offenses." Although the State insists that this does not make it propensity evidence, that is exactly what it is, as its sole purpose was to impermissibly attempt to persuade the jury that because the defendant engaged in armed offenses in the past, he must have engaged in them as charged in the present case, regardless of the lack of similarity—other than being armed—between the prior convictions and the charged offenses. As noted above, firearms, unfortunately, are involved in all kinds of crimes, and to allow the mere alleged presence of a firearm that was different from the firearm used in the previous crimes to, without more, justify the introduction of other-crimes evidence would eviscerate the principles underlying Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011), and, as stated earlier, would be contrary to literally decades of case law. See, *e.g.*, *Manning*, 182 Ill. 2d at 213-14 (other-crimes evidence "is objectionable not because it has little probative value, but rather because it has too much," as it "overpersuades a jury, which might convict the defendant only because it feels that defendant is a bad person who deserves punishment," which is impermissible in light of the fact that "[t]he law distrusts the inference that because a person has committed other crimes, he or she is more likely to have committed the current crime[,] '[a]nd so, as a matter of policy, where the testimony has no value beyond that inference, it is excluded' " (quoting *Lehman*, 5 Ill. 2d at 342)). Accordingly, the other-crimes evidence in this case did not qualify as evidence of lack of mistake, or of intent, and to the extent it was admitted for those purposes, an abuse of discretion occurred.

¶ 57    Having concluded that no permissible reasons existed for the introduction of the name of, nature of, and facts surrounding the defendant's two prior felony convictions, we must decide if the admission of that information, by means of the testimony of Sheriff Bullard and the admission of a certified copy of the convictions, was harmless or requires reversal. "Although the erroneous

26

admission of other-crimes evidence ordinarily calls for reversal, the evidence must have been a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different. If it is unlikely that the error influenced the jury, reversal is not warranted." *People v. Hall*, 194 Ill. 2d 305, 339 (2000). The defendant posits on appeal that it is the State, not the defendant, that bears the burden of persuasion to prove beyond a reasonable doubt that the result would have been the same without the error. See, *e.g.*, *People v. Gregory*, 2016 IL App (2d) 140294, ¶ 28. The defendant further posits this is true because, in a harmless error scenario such as this one, the defendant has done everything the defendant could do to prevent the error from reaching the jury, and therefore has properly preserved the defendant's claim of error (as happened in this case when defense counsel argued against the admission of the other-crimes evidence during the hearing on the motions *in limine* prior to trial, made contemporaneous objections at trial to the admission of the certified copy of the convictions and to Sheriff Bullard's testimony, and included this issue in his posttrial motion), which makes it appropriate for the State to bear the burden of persuasion to prove beyond a reasonable doubt that the result would have been the same if the State had not, over the objections of the defendant, introduced the error at trial. See, *e.g.*, *People v. Herron*, 215 Ill. 2d 167, 181-82 (2005). We note, however, that in *In re E.H.*, 224 Ill. 2d 172, 180 (2006), our Illinois Supreme Court addressed two different review levels and noted "there is a somewhat higher bar for constitutional error than other trial error to be deemed harmless error." The court compared the requirements set forth in *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990), with those in *Chapman v. California*, 386 U.S. 18 (1967), and noted that "evidentiary error is harmless 'where there is no *reasonable probability* that the jury would have acquitted the defendant absent the' error." (Emphasis in original.) *In re E.H.*, 224 Ill. 2d at 180 (quoting *Nevitt*, 135 Ill. 2d at 447). However, " 'before a federal constitutional error can be held

27

harmless, the court must be able to declare a belief that it was harmless *beyond a reasonable doubt*.' " (Emphasis in original.) *Id.* (quoting *Chapman*, 386 U.S. at 24). Thus, pursuant to *E.H.* and *Nevitt*, the proper standard in this case, which involves an evidentiary error, arguably is whether there is no reasonable probability that the jury would have acquitted the defendant absent the error. Regardless of the standard of review we employ, we note that previous Illinois decisions have also held that "[i]n purely circumstantial cases such as this one, other crimes evidence, if improperly admitted, can never be harmless error" (*People v. Richee*, 355 Ill. App. 3d 43, 60-61 (2005)), and that the only exceptions that have been carved out are for cases involving a conspiracy. See *People v. Cerda*, 2021 IL App (1st) 171433, ¶¶ 117-22.

¶ 58　　The State argues that even if the admission of the other-crimes evidence in this case was erroneous, the error was harmless because it was unlikely to have influenced the jury, because, according to the State, at trial "[t]he disputed issue was the defendant's possession of a firearm which was conclusively proven by the defendant's phone call," especially when one considers that, despite claiming in a telephone call to have discarded his "shoes" during or after the pursuit, "when the defendant was taken into custody, he was wearing shoes."

¶ 59　　Regardless of which standard of review we employ, we do not agree with the State that the defendant's telephone call statements provided "conclusive" evidence of the defendant's guilt, or that the erroneous admission of the other-crimes evidence was unlikely to influence the jury. Although, as explained below, we do believe that there was sufficient evidence to sustain the defendant's convictions for purposes of both a *corpus delicti* analysis and a double jeopardy analysis, we agree with the defendant that the wrongfully-admitted other-crimes evidence in this case "created a clear risk that the jury convicted [the defendant] because he committed crimes with a firearm in the past and to prevent him from committing future crimes." As explained above, to

28

prove the serious felony charges against the defendant in this case—and thus, to secure the 20-year sentences eventually imposed upon the defendant—the State had to prove beyond a reasonable doubt that the defendant, while fleeing or eluding the police, possessed a firearm. No firearm was found on the person of the defendant when he was arrested shortly after the pursuit was terminated, no firearm was found in the car that he was driving during the pursuit, and no firearm was found in the immediate area of the car, despite protracted searching by multiple police officers, on the day of the pursuit. A firearm was found the next day, several blocks away from the area the officers previously searched, and its location was consistent with the location of a "football" or "shoes" discussed by the defendant in telephone calls from the jail. However, no physical evidence linked the firearm to the defendant, he was not seen possessing it or driving in the alley in which it was found, and no witness was able to testify with regard to when the firearm might have been placed where it was found, and therefore, how long it had been there.

¶ 60     The evidence, as the trial judge acknowledged when denying the defendant's motion for a directed verdict, was circumstantial. We agree that a jury certainly could have concluded on the basis of the evidence presented at the defendant's trial that the State's theory of the case was correct, and that the defendant possessed the firearm during the pursuit, discarded it after the pursuit in the vegetation where it was eventually found, and, once jailed, attempted to send coded messages using references to a "football" and to "shoes" in an effort to have others recover the firearm before the police could find it and charge the defendant with possessing it. That said, a jury that was not improperly informed of the defendant's previous criminal involvement with firearms might have been less likely to believe the State's theory that the defendant's coded messages referred to a firearm, and more likely to conclude that they just as easily may have referred to other contraband that the defendant possessed during the pursuit instead of a firearm—

29

such as narcotics or a large amount of cash—which also may have been stashed in the same general area of vegetation that someone stashed the gun, but that was recovered by an unknown third party before the police arrived and located the gun in that same general area of vegetation.

¶ 61    We believe this is true even though, as discussed below, we do not believe the defendant has shown that it was error for the jury to be informed that the police had received information that the defendant was in possession of a firearm. Being made aware of information that led police to *investigate whether* the defendant was in fact in possession of a firearm is far different from being made aware of the uncontroverted fact that the defendant had two previous felony convictions involving his possession of firearms, especially when the jury was informed of this fact by means of live testimony from a law enforcement witness who did not testify about the 2019 incident at all, and whose sole purpose as a witness seems to have been to ensure that the jury knew that the defendant was one of two individuals who "forced entry into [the victim's] residence armed with handguns" during one of these crimes. Indeed, as explained further below, the State—at trial and on appeal—has pointedly argued that the fact that the police had received information that the defendant was in possession of a firearm was *not* submitted by the State as a means to prove the truth of the matter asserted (and, accordingly, was not impermissible hearsay), whereas the fact of the defendant's two prior felony convictions involving firearms *absolutely* was submitted to prove the truth of those convictions, as well as the circumstances surrounding them. In light of the foregoing, we conclude that the State cannot prevail regardless of which standard of review we employ. Under the standard proposed by the defendant, we conclude that the State has not met its burden to prove beyond a reasonable doubt that the result of the defendant's trial would have been the same without the erroneously-admitted other-crimes evidence linking the defendant to prior crimes in which he possessed firearms. See *Gregory*, 2016 IL App (2d) 140294, ¶ 28. Likewise,

30

even when we examine this case under the standard of review found in *In re E.H.*, 224 Ill. 2d 172, 180 (2006), and its progeny, we conclude that the error here was not harmless, because the facts in this case do not support the conclusion that there was no reasonable probability that the jury would have acquitted the defendant absent the error.

¶ 62    In the alternative, the State argues the error was harmless because it was cured by the jury instructions in this case. The defendant counters that although jury instructions may, under certain circumstances, cure evidentiary errors, they did not do so in this case, because the instructions told the jury that it *could* consider the other-crimes evidence, albeit for limited purposes,[1] when in fact the jury never should have heard the evidence, and therefore should not have been allowed to consider it for any purpose at all. The defendant is correct. As we observed in *Lenley*, because "we presume that jurors take direction from limiting instructions and consider evidence only in a manner in which they are told to consider it, the instruction on the use of other-crimes evidence, if given, needs to be accurate." 345 Ill. App. 3d at 411. As we added, "[w]hen jurors are told to consider this kind of evidence for intent, motive, design, and lack of mistake and the evidence has no bearing on those matters, jurors have no way to use the evidence in an appropriate limited manner." *Id*. If, as in this case, "evidence that harbors such a potential for misuse has been admitted and jurors have been told to consider it for the wrong reasons, we cannot presume that jurors used the evidence for a limited valid reason about which they were not informed." *Id*. at 412. It is self-evident that we also cannot presume, under such circumstances, that the jury, *sua sponte*, disregarded the improperly-admitted other-crimes evidence entirely. Accordingly, there is simply

---

[1]Although not mentioned on appeal by either party, we note that counsel for the State also told the jury, in closing argument, that the other-crimes evidence could "be considered for the very limited purpose of illuminating the defendant's intent to possess a firearm," although in the next breath counsel added, "the history with firearms," which arguably suggested to the jury that the evidence could be considered for propensity purposes as well.

31

no way to conclude that the jury instructions in this case "cured" the error in admitting the other-crimes evidence.

¶ 63 For the foregoing reasons, we must reverse the defendant's convictions and sentences. As discussed below, because double jeopardy does not bar a retrial of the defendant, we also remand for a new trial. Because the second issue raised by the defendant in this appeal is likely to recur on remand during a retrial, and because the defendant's third issue on appeal is relevant to whether there can be a remand, we address those issues to the extent we deem appropriate and necessary. See, *e.g.*, *People v. Stitts*, 2020 IL App (1st) 171723, ¶ 33 (appellate court has authority to address issues likely to recur on remand, but should not decide issues where resolution will have no effect on disposition of present appeal).

¶ 64 The defendant's second contention on appeal is that the trial judge abused his discretion when he allowed testimony that the police had received information that the defendant was in possession of a silver revolver, in a specific car, and with a warrant for his arrest, because all of this information was based on hearsay, and because "none of this testimony was subject to cross[-]examination" and thus presents confrontation clause problems. He concedes that the only objection made by defense counsel in the trial court was a hearsay objection (both prior to trial and at trial) to the admission of evidence that the police had received information that the defendant was in possession of a silver revolver, but asks us to review the remainder of the purported errors—including his confrontation clause claim—as plain error or ineffective assistance of counsel. We deem it necessary, for purposes of remand, to address only the specific issue that was raised by the defendant in the trial court, and only to the extent that it was raised—and actually argued—there. As noted above, in the trial court defense counsel did not argue specifically that if the police were allowed to testify that they believed the defendant possessed a firearm, they nevertheless should

32

not be allowed to testify as to any details about the firearm they believed he possessed, such as that they believed it was a "silver revolver."

¶ 65    The Illinois Supreme Court, while acknowledging the general prohibition against hearsay, has recognized an investigatory procedure exception under which it "has held that a police officer may recount the steps taken in the investigation of a crime, and may describe the events leading up to the defendant's arrest, where such testimony is necessary and important to fully explain the State's case to the trier of fact." *People v. Simms*, 143 Ill. 2d 154, 173-74 (1991). The *Simms* court noted "that a police officer may testify about his conversations with others, such as victims or witnesses, when such testimony is not offered to prove the truth of the matter asserted by the other, but is used to show the investigative steps taken by the officer." *Id.* at 174. The court added that "[t]estimony describing the progress of the investigation is admissible even if it suggests that a nontestifying witness implicated the defendant." *Id.*

¶ 66    In this case, the defendant argues that "all the police needed to testify was that they were acting upon information received or that they saw [the defendant] commit a traffic infraction and initiated a traffic stop." He further argues that "[a]ny information beyond this traffic infraction, including the tip and the parole warrant, was unnecessary to explain the [investigatory steps, and constituted] hearsay not subject to cross[-]examination." He contends that "[i]f more information were needed, it should have been limited to the police testifying they acted upon information received[,] not providing specific details."

¶ 67    However, such testimony would not have been sufficient to explain why, after the pursuit ended and the defendant was arrested, the police (1) spent hours searching the area of the pursuit, (2) listened to the content of the defendant's phone calls from the jail and watched videos of his visits at the jail, and, perhaps most importantly, (3) interpreted references to a "football" and to

33

"shoes" as actually referring to a firearm, which in turn led them to conduct additional searches and eventually locate the firearm that led to the charges in this case. For the jury to understand these important steps in the investigatory process, it was necessary, as well as important to a full explanation of the State's case (see *id.*), for the jury to be informed of the specific fact that the police had received information that the defendant possessed a firearm. In the absence of this information, the jury likely would have been—and understandably so—confused about how the charges being tried actually came about. Not knowing the vital fact that the police had received information that the defendant possessed a firearm, but knowing the lengths to which the police went to find a firearm in this case, the jury might even have concluded, wrongfully, that there was police overreach, or some kind of "setup" of the defendant, in this case.

¶ 68    Accordingly, we decline to make a blanket ruling that on remand the State may not introduce evidence, as part of its explanation of the police investigation in this case, that the police had received information that the defendant possessed a firearm. In addition, we agree with the State that the following related issues were not, for various reasons, either properly preserved in the trial court, or actually argued there, and we decline to address them (see, *e.g.*, *Stitts*, 2020 IL App (1st) 171723, ¶ 33 (appellate court has authority to address issues likely to recur on remand, but should not decide issues where resolution will have no effect on disposition of present appeal)): (1) whether it was necessary to inform the jury that the vehicle being driven by the defendant was registered to someone other than the defendant, (2) whether it was necessary to inform the jury that there was an active warrant for the defendant's arrest, (3) whether the admission of the fact that the police had received information that the defendant was in possession of a firearm violated the defendant's rights under the confrontation clause, and (4) whether it was prejudicial to allow police to testify that they believed the defendant was in possession of a "silver revolver," rather

than allowing them to testify only that they believed the defendant was in possession of a firearm. On remand, the defendant is of course free to raise any or all of these issues prior to trial if he is concerned about possible prejudice from this information, and the State is free to argue its position if it believes the information is necessary to its case and does not violate the defendant's right to confront the witnesses against him or other rights of the defendant.

¶ 69    With regard to the defendant's third issue, we find no merit to the defendant's contention that the State failed to prove the *corpus delicti* of his convictions because the "only evidence of firearm possession was [the defendant's] own statements." As the State correctly notes, the Illinois Supreme Court has held that "[t]he *corpus delicti* of an offense is simply the commission of a crime." *People v. Lara*, 2012 IL 112370, ¶ 17. As the *Lara* court noted, "[a]long with the identity of the person who committed the offense, it is one of two propositions the State must prove beyond a reasonable doubt to obtain a valid conviction." *Id*. The court further noted that "[i]n general, the *corpus delicti* cannot be proven by a defendant's admission, confession, or out-of-court statement alone," and that "[w]hen a defendant's confession is part of the *corpus delicti* proof, the State must also provide independent corroborating evidence." *Id*. That "independent evidence need only *tend to show* the commission of a crime," and "need not be so strong that it alone proves the commission of the charged offense beyond a reasonable doubt." (Emphasis in original.) *Id*. ¶ 18. The *Lara* court added that "[i]f the corroborating evidence is sufficient, it may be considered, together with the defendant's confession, to determine if the State has sufficiently established the *corpus delicti* to support a conviction." *Id*. The *Lara* court explained that "[t]he *corpus delicti* rule arose from courts' historical mistrust of out-of-court confessions," which in turn arose because of concerns that some people have a "tendency to confess, for various psychological reasons, to offenses that they did not commit or that did not occur, and [because of]

35

the unreliability of coerced confessions." *Id.* ¶ 19. Ultimately, the *Lara* court held "that the *corpus delicti* rule requires only that the corroborating evidence correspond with the circumstances recited in the confession and tend to connect the defendant with the crime," and that "[t]he independent evidence need not precisely align with the details of the confession on each element of the charged offense, or indeed to any particular element of the charged offense." *Id.* ¶ 51.

¶ 70 We first note a point not raised by the State on appeal: in this case, there was no "confession" to the police at all. Whatever the meaning of the defendant's out-of-court statements about a "football" and about "shoes," the statements were not made to police, and were clearly self-serving attempts to convey some kind of message—whether innocent or not—to friends, family, or colleagues outside of jail. Thus, the historical mistrust of out-of-court "confessions" that underpins much of the *corpus delicti* jurisprudence, and that arises, as noted above, from concerns that some people may confess to offenses that they did not commit or that did not occur, as well as from concerns that confessions might be coerced (see, *e.g.*, *id.* ¶ 19) is of questionable relevance to this case.

¶ 71 That issue notwithstanding, we agree with the State that the circumstantial evidence corroborating the defendant's out-of-court statements in this case was sufficient to prove the *corpus delicti* of the charges and to sustain the defendant's convictions. As described above, the jury was presented with corroborating evidence that consisted of police testimony about how, based upon the factual details found in the defendant's telephone call statements, they used video footage from their squad cars, as well as other information they knew about the pursuit, to locate a specific alley which matched the defendant's telephone call description. The corroborating testimony showed that this, in turn, led them to the vegetation in that alley where the weapon was

36

found, which was near tire marks that police believed indicated a car may have stopped rapidly there. We reiterate that pursuant to the standards set forth in *Lara*: (1) the corroborating independent evidence need only *tend to show* the commission of a crime, and need not be so strong that it alone proves the commission of the charged offense beyond a reasonable doubt (*id*. ¶ 18), and (2) "the *corpus delicti* rule requires only that the corroborating evidence correspond with the circumstances recited in the confession and tend to connect the defendant with the crime," not that it "precisely align with the details of the confession on each element of the charged offense, or indeed to any particular element of the charged offense." *Id*. ¶ 51. In this case, those standards were met, because the corroborating evidence absolutely corresponds with the information in the defendant's out-of-court telephone call statements, and tends to show that the defendant, while being pursued, was in possession of the gun, which he later discarded in the spot where it was found thereafter by the police. When this sufficient corroborating evidence is considered together with the defendant's out-of-court telephone call statements (see *id*. ¶ 18), it is clear that the State has sufficiently established the *corpus delicti* to support the defendant's convictions.

¶ 72    Thus, for the foregoing reasons, the defendant's third argument fails. Likewise, because we have considered all of the evidence presented at trial with regard to each of the defendant's convictions, and find it sufficient to support those convictions, double jeopardy does not prevent the retrial of the defendant. See, *e.g.*, *People v. Jamison*, 2014 IL App (5th) 130150, ¶ 18 (if evidence was sufficient to convict the defendant, principles of double jeopardy do not preclude retrial). We reach this conclusion because when we consider whether double jeopardy bars a retrial, the relevant question before us is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. See, *e.g.*, *People v. Lopez*, 229 Ill. 2d 322, 367 (2008). We have set

37

out the evidence against the defendant in this case in extensive detail above. We conclude that although the evidence was circumstantial, a rational jury could have found, from this evidence, the essential elements of the crimes of which the defendant was convicted beyond a reasonable doubt.

¶ 73                                    III. CONCLUSION

¶ 74    For the reasons stated above, we reverse the defendant's convictions and sentences, and remand for a new trial.


¶ 75    Reversed; cause remanded for a new trial.